# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-3724

MICHAEL C. CICHON,

*Plaintiff-Appellant,*

v.

EXELON GENERATION COMPANY, L.L.C.,

*Defendant-Appellee.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 02 CV 3441—**Charles P. Kocoras**, *Chief Judge.*

———————

ARGUED APRIL 14, 2004—DECIDED MARCH 21, 2005

———————

Before BAUER, COFFEY and KANNE, *Circuit Judges.*

COFFEY, *Circuit Judge.* Michael Cichon was employed as a "Unit Supervisor" for Exelon Generation Company at its Byron, Illinois, nuclear power plant, until he was removed from the position because Exelon believed that he lacked the necessary leadership qualities. A few weeks later, Cichon applied for a different position with Exelon at their Byron plant, as a "Turbine Project Manager," but was not hired because of his lack of leadership skills. Thereafter, Cichon filed suit against Exelon under § 215(a)(3) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, alleging that Exelon had removed him from his Unit

Supervisor position and refused to hire him for the Turbine Project Manager position in retaliation for his having filed a prior lawsuit against Exelon under the FLSA.[1] The district court granted summary judgment to Exelon, finding Exelon had offered legitimate, non-retaliatory reasons for its decision to remove him as a Unit Supervisor and declining to hire him as a Turbine Project Manager and went on to conclude that Cichon had failed to demonstrate that these reasons were pretextual. Cichon appeals, we affirm.

## I. BACKGROUND

Cichon was employed at Exelon's Byron plant for fifteen years in various non-managerial positions until he transferred to a position as a Unit Supervisor in the plant's Operations Department ("OD") in 1998. As a Unit Supervisor, Cichon served as a mid-level manager and also assisted in the hands-on operation of the plant's two nuclear reactors. In January of 2000, management became concerned with Cichon's leadership and supervisory skills, and his repeated failure to follow plant procedures. On June 26, 2001 Cichon gave his supervisors further cause to question his leadership abilities and adherence to plant procedures when he performed poorly during a reactor shutdown. On that date, due to a mechanical malfunction, one of the reactors had to be shut down. Once a reactor is shut down, the "feedwater" pump[2] that supplies feedwater to the core of the nuclear reactor temporarily discontinues func-

---

[1] Section 215(a)(3) of the FLSA states, in relevant part, that "it shall be unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA]."

[2] The feedwater pump supplies feedwater to the reactor core of a nuclear reactor, which the reactor then heats into steam to turn the turbine-generator, producing electricity.

tioning, requiring the use of an "auxiliary feedwater pump" to keep the feedwater flowing into the reactor core in order that the steam generator can continue to remove heat from the reactor core. When the reactor is brought back on line, the auxiliary feedwater pump is manually shut down once the main operating pump is functioning normally. Cichon's role in the process of bringing the reactor back on line was to order the auxiliary feedwater pump shut down when the main feedwater pump was operational. Cichon ordered the premature shutdown of an auxiliary pump before the main pump was ready to take over, a procedural gaffe that caused the auxiliary pump to restart unexpectedly. The error was serious enough that Exelon was forced to conduct an internal investigation into Cichon's premature restart of the auxiliary feedwater pump and file a report with the Nuclear Regulatory Commission. Cichon's poor performance in this critical and potentially hazardous situation resulted in his being formally reprimanded for failing to follow procedural guidelines and his being warned, in writing, that he needed to improve his performance, comply fully with Exelon's procedures and exhibit improved leadership on the job or he would be subject to further discipline, up to and including termination.

Because of Cichon's serious error and other problems at the plant caused by OD personnel failing to comply with plant procedures, the plant's upper management moved in to rectify the situation and directed a "re-alignment" of the OD through a "Leadership Assessment Process" ("LAP"). The LAP required all supervisory-level employees in the department to successfully complete a series of individual interviews in order to retain their positions.

On September 10, 2001, as part of the LAP Cichon was interviewed by an internal panel comprised of upper-level supervisors in the OD along with representatives from the Byron nuclear plant's human resources department. During the interview Cichon and other managers were asked a

series of questions designed to ascertain whether they possessed the necessary leadership and behavioral skills that Exelon expected of its management-level employees. The questions were framed in a manner designed to gauge "competencies"[3] in eleven different categories of "fundamentals."[4] In order for Cichon to retain his position as Unit Supervisor, he was required to demonstrate to the interviewing panel that he was at least "competent" as opposed to "developmental" or only developmentally qualified. Upon completion of the interviewing process, the LAP panel tallied up the scores and determined that Cichon demonstrated the required competency in only three of the eleven categories. Accordingly, the panel concluded that although Cichon might be an "acceptable candidate [for the] short term [because he] has the technical ability to perform the job[, in

[3] In accordance with the parameters given to the LAP panel, "competency" level was rated as either a "strength," a "mere competence," or as a "developmental need." Concerning employees who scored in the "developmental need" range of the evaluation criteria, Diana Sorfleet, Manager of Employee Relations at Exelon testified that "[w]e looked at which [fundamentals] were difficult to develop, and based on the improvements that we needed, we made decisions to say that if an employee has, you know, two or three of these [fundamentals] that all need development, we don't have the time or the money to invest in developing those [fundamentals] when we're in a turn-around situation." Therefore, the ranking of an employee's performance in a given area as a "developmental need" was the equivalent of a deficient or unsatisfactory mark in that given area.

[4] The eleven categories of "fundamentals" required of Unit Supervisors were: 1) "Drives for Results"; 2) "Actively Communicates"; 3) "Models our Values"; 4) "Builds Relationships"; 5) "Provides Direction"; 6) "Develops Others"; 7) "Fosters Teamwork and Collaboration"; 8) "Motivates and Inspires Passion"; 9) "Selects Talent"; 10) "Leverages Resources"; and 11) "Motivational Fit."

the] long-term [he] does not possess the leadership abilities that provide a good motivational fit for the position." On October 1, 2001, after all the supervisory-level employees in the OD had been interviewed, the LAP panel met and rendered its final decisions as to those who qualified to staff the Unit Supervisor position. The committee determined that because Cichon had failed to meet the minimum competency requirements to qualify for a supervisory position he should be removed from his Unit Supervisor position.

Prior to the committee's determination, on September 25, 2001, Cichon had filed a lawsuit against Exelon under the FLSA, challenging the recent changes Exelon had instituted in its overtime pay scale for its management-level employees.[5] On October 23, 2001, Cichon was officially removed as a Unit Supervisor. At that time, Cichon was advised that his removal was precipitated by several factors; his poor performance in his LAP interviews, his failure to follow the company's reactor start-up procedures in June of 2001 and his subsequent failure to "demonstrate[] [a] behavior change toward embracing and institutionalizing standards and fundamentals."

After his removal as a Unit Supervisor, Cichon had, in accordance with Exelon's policy, sixty days to find another position within the company before he was subject to final termination.[6] During this time period, Cichon applied for the "Turbine Project Manager" position after Mike Kelly, the individual in charge of the turbine projects at Exelon's Illinois plants, informed him that the position was open and

---

[5] Upper management at the Byron plant were not notified about Cichon's lawsuit until October 2, 2001.

[6] Cichon continued to receive his previous salary and benefits during this 60-day time frame.

even went further and informed Cichon that, in his opinion, he felt that he might be a "good fit" for the position.

Cichon, because of his technical qualifications, was chosen as one of the four finalists for the position. However, Exelon's management team sought to staff the position based on more than technical skills alone and was looking for candidates with superior leadership, behavioral and management skills. As part of the selection process, the candidates had to score well in two interviews before two separate panels of interviewers. The panelists were assigned to ask each of the interviewees a series of questions and, based on the applicants' responses, determine which one of the candidates possessed the superior leadership and behavioral skills required for the job. Cichon, along with three other employees participated in the interviews, and placed second out of the four candidates interviewed. Tim Nolan received the top score and was accordingly awarded the position, rather than Cichon or the other candidates who had scored lower.

Kelly, who had advised Cichon of the Turbine Project Manager opening, was one of the panelists who interviewed Cichon and the other candidates for the position. The record demonstrates that, along with his interviewing partner, Kelly scored Cichon lower than did the other team while rating him on identical criteria. Kelly stated in deposition testimony that although he learned of Cichon's having filed a FLSA lawsuit during the interview with Cichon, that knowledge did not affect how Cichon was rated, nor did it affect the interviewing teams' collective final decision to hire Nolan. Kelly further stated that Nolan was hired for the position rather than Cichon solely because Nolan achieved higher scores overall during the interview and rating process. Following Cichon's failure to obtain the Turbine Project Manager position, he applied for other positions with Exelon, and, on December 12, 2001, accepted a position as a dispatcher at a Joliet facility operated by a subsidiary of Exelon's parent company.

On May 13, 2002, Cichon filed his second suit against Exelon under the FLSA, alleging that Exelon's decisions to remove him from his Unit Supervisor position and not hire him for the Turbine Project Manager position were made in retaliation for his filing of the initial FLSA overtime pay lawsuit.[7] After discovery, Exelon moved for summary judgment and also filed a document entitled "Statement of Uncontested Material Facts," as required pursuant to the United States District Court for the Northern District of Illinois' Local Rule 56.1. Cichon responded by filing a brief in opposition to Exelon's motion for summary judgment, and included with this filing a response to their "Statement of Uncontested Material Facts." In this document, Cichon addressed Exelon's proposed facts line-by-line and admitted some of the facts, but denied the accuracy of a large number of Exelon's statements of facts. Our review of Cichon's response establishes that a great many of Cichon's written attempts in opposition to Exelon's statement of material facts amount to nothing more than conclusory statements, unaccompanied by required record citations while others contain only cursory analysis with citations to portions of the record that failed to support his denials, constituting a violation of Local Rule 56.1. In his response, Cichon also set forth a number of his own proposed facts, which he contended required a denial of Exelon's motion for summary judgment. However, Cichon failed to list these "additional facts that require the denial of summary judgment" in a *separate* statement of facts document as required under Local Rule 56.1. Consequently, when the district court addressed Exelon's motion for summary judgment, the judge properly refused to accept a majority of Cichon's proposed facts in light of the fact that he had failed to comply with Local Rule 56.1 when he: "(1) [made] new factual assertions

---

[7] Cichon's overtime pay lawsuit was dismissed with prejudice, on the plaintiff's own motion, on September 12, 2002.

in [his] response without filing a Statement of Additional Facts in violation of Local Rule 56.1(b)(3)(B); (2) improperly den[ied] the accuracy of a large number of Exelon's facts as asserted with evasive responses in violation of Local Rule 56.1(b)(3)(A); and (3) support[ed] [his] responses with self-serving affidavits or unauthenticated documents."

Relying primarily on Exelon's properly submitted facts, the court granted summary judgment to Exelon. In conjunction with this conclusion the court assumed, for the purposes of its analysis, that Cichon had established a prima facie case of retaliation. However, the court went on to find that Exelon had ultimately carried its burden by offering legitimate, non-discriminatory reasons for both removing Cichon from his Unit Supervisor position and failing to subsequently hire him for the Turbine Project Manager opening. In doing so Exelon argued that Cichon was removed from the Unit Supervisor position because of his failure to demonstrate proper supervisory and leadership skills, both in his day-to-day job performance and in his responses to questions posed to him during the interviews conducted by the LAP; and furthermore that Nolan was hired rather than Cichon for the Turbine Project Manager position because Nolan was rated as the "more qualified" candidate in the evaluation proceedings conducted by the interviewing panels. The court went on to hold Cichon had failed to demonstrate that Exelon's proffered legitimate business reasons for terminating Cichon and subsequently failing to hire him for another position at the Byron Plant were pretextual, and entered judgment for Exelon. Cichon appeals.

## II. ISSUES

Cichon contends that the district court abused its discretion when it determined that he failed to comply with Local Rule 56.1 and discounted a great majority of the facts he set forth in response to Exelon's motion for summary

judgment. Cichon also argues that the district court's grant-
ing of summary judgment for the defendant was improper
because he had demonstrated that the reasons Exelon
offered for removing him from his Unit Supervisor position
and then failing to hire him for the Turbine Project Manager
position were pretextual.

## III. ANALYSIS

### A. Cichon's Failure to Comply with Local Rule 56.1

Cichon claims that the district court abused its discretion
when it determined that he failed to comply with the
provisions of Local Rule 56.1 by not including a separate
statement of additional facts and discounted, or refused to
consider, most of the facts that he submitted in response to
Exelon's motion for summary judgment. Cichon posits that
if the court had accepted his set of proposed "facts," it would
have concluded that summary judgment in favor of Exelon
was not proper.[8] We review a district court's decision
concerning whether a litigant complied with a local rule,
such as Local Rule 56.1, for an abuse of discretion. *Ammons
v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir.
2004). Specifically as to Local Rule 56.1, "[w]e have . . .
repeatedly held that a district court is entitled to expect

---

[8] The two "facts" that Cichon contends precluded summary
judgment are his allegations that: 1) he was "the only [Unit
Supervisor] discharged as a result of the [LAP]"; and 2) "both
selecting officials [for the Turbine Project Manager position]
admitted that [he] was the best qualified candidate for the job."
Appellant's Br. at 20. For the sake of completeness, we have
examined the record thoroughly and can find no support for these
allegations aside from Cichon's own self-serving and unauthenti-
cated statements, which are insufficient to create a genuine issue
of material fact. *See Rogers v. City of Chicago*, 320 F.3d 748, 751
(7th Cir. 2003).

strict compliance with [Local] Rule 56.1." *Id.* (citing *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000) and *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994)). Local Rule 56.1 <u>requires specifically</u> that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate "statement . . . of any additional facts that require the denial of summary judgment." Local Rule 56.1(b)(3)(B); *see also Ammons*, 368 F.3d at 817; *Smith v. Lamz*, 321 F.3d 680, 682 n.2 (7th Cir. 2003); *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1312 (7th Cir. 1995). A district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed. *Midwest Imports*, 71 F.3d at 1316. Indeed, as we have stated on a number of occasions, "[a] local rule of a federal district court is written by and for district judges to deal with the special problems of their court, and we are disposed therefore to give a district judge's interpretation of his court's local rules . . . considerable weight." *Id.*

Cichon failed to file a statement of additional facts in opposing Exelon's motion for summary judgment, and admits in his brief that he only identified his proposed facts "in [his] response to [Exelon's] statement of facts" rather than filing a separate statement of proposed facts. In defense of his failure to submit his own statement of <u>additional</u> facts, Cichon mistakenly takes the position that "[t]here was no need to make such a submission," because the Northern District of Illinois' Local Rule 56.1 does not require him to do so. However, as we have noted above, <u>Local Rule 56.1 does require that he make such a submission</u>, that is, as long as he wants the court to consider his proposed "facts" when determining whether a dispute over facts material to the case exists that requires a denial of summary judgment. Because Cichon failed to comply with Rule 56.1 which requires that a litigant file a separate statement of additional

facts, we hold that it was not an abuse of discretion for the district court to ignore most of Cichon's proposed "facts" when ruling on Exelon's motion for summary judgment. *Id.* Accordingly, for the purposes of this appeal we will consider only those facts that the trial judge found not to be excluded under Rule 56.1 when addressing the remainder of Cichon's claims. *Id.* at 1312.

### B.  Cichon's Retaliation Claims

Cichon next argues that it was improper for the trial judge to grant summary judgment in Exelon's favor because he successfully demonstrated that the reasons Exelon offered for removing him from his Unit Supervisor position and then refusing to hire him for the Turbine Project Manager position were pretextual. We review *de novo* the district court's grant of summary judgment to Exelon. *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 668 (7th Cir. 2004). To establish a claim under § 215(a)(3) of the FLSA, Cichon has the burden of demonstrating that Exelon engaged in retaliatory conduct, either through the direct or indirect method of proof. *See Scott v. Sunrise Healthcare Corp.*, 195 F.3d 938, 940 (7th Cir. 1999). Cichon concedes that he has no direct evidence that Exelon removed him from the Unit Supervisor position and failed to hire him for the Turbine Project Manager position simply because he filed a lawsuit against Exelon under the FLSA. Thus, Cichon frames his argument according to the indirect method of proof under the familiar burden-shifting framework prescribed by the Supreme Court in *McDonnell Douglas*, as adapted for use in the context of retaliation claims. *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

1.  Removal from the Unit Supervisor Position

Cichon argues that the court improperly granted summary judgment to Exelon on his allegation that he was retaliated against when removed from the Unit Supervisor position and asserts that he produced sufficient evidence of discrimination to demonstrate a disputed issue of fact as to whether Exelon's proffered reason for removing him from the position was pretextual. In order to reach the pretext stage of the *McDonnell Douglas* analysis, Cichon was initially required to present a prima facie case of retaliation by demonstrating, among other things, that "he was performing his job in a satisfactory manner." *Stone*, 281 F.3d at 644. Although the district court assumed that Cichon met this requirement, after review of the record we are forced to disagree and are convinced that Cichon was not performing his job in a satisfactory manner at the time he was terminated from his position at Exelon, and thus failed to clear the initial hurdle of making out a prima facie case of discrimination.

Beginning in January of 2000, Cichon's supervisors started to question his leadership and supervisory skills, and became aware that Cichon had often failed to follow required safety procedures at Exelon's Byron plant. Indeed, in June 2001, Cichon's failure to adhere to plant procedures caused a very serious problem when he improperly shut down the reactor's auxiliary feedwater pump, and caused an undesirable chain of events that ended in Exelon's filing of a report with the Nuclear Regulatory Commission. *See supra* pp. 2-3. And, perhaps more damaging to Cichon's case, were the results of the interviews that he participated in as part of Exelon's department-wide LAP evaluations during September of 2001, where he performed so poorly that the interviewing panel rated him as "developmental," or

deficient[9] in eight of the eleven categories selected by Exelon to evaluate leadership and behavior skills. As a result, the interviewing panel determined that Cichon failed to "possess the leadership abilities that provide a good motivational fit for the [Unit Supervisor] position."

Cichon's error during the restart of the reactor and Exelon's poor LAP evaluation of Cichon occurred prior to the company receiving notice of Cichon's lawsuit and were certainly indicative of Cichon's inability to perform his job in a satisfactory manner and *ipso facto* justified Exelon's decision to remove him as a Unit Supervisor. Accordingly, Cichon's attempt to rely merely on a "suspicious timing" theory falls far short of creating any logical or reasonable inference that Exelon's complaints about his unsatisfactory job performance were not based in fact, but instead were trumped-up charges invented by Exelon merely to cloak their clandestine retaliatory motive for removing him as a Unit Supervisor. *See Lang v. Ill. Dep't of Children & Family Servs.*, 361 F.3d 416, 419-20 (7th Cir. 2004); *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728-29 (7th Cir. 2003); *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 533-34 (7th Cir. 2003). In spite of the fact that Exelon did not inform Cichon of its decision to remove him from the position until after he filed his FLSA suit, the record clearly establishes that Exelon had been "contemplating [Cichon's removal] before it learned of the suit [and] [e]mployers need not suspend previously planned [employment actions] upon discovering that [an FLSA] suit has been filed, and their proceeding along lines previously contemplated . . . is no evidence

---

[9] As Exelon's Manager of Employee Relations, Diana Sorfleet explained: " 'needs development,' and too many 'developmental' scores means that the employee is so deficient (in Exelon's opinion) that he is not worth the time, money and effort it would take to properly develop these deficiencies to the point where he is 'competent' in fundamental areas." *See supra* note 3.

whatever of causality." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001).

Exelon has every reason to expect that each of its Unit Supervisors possess and exhibit the necessary leadership and supervisory skills, and follow the procedures required to ensure the safe operation of its nuclear power plants. The record demonstrates that Cichon fell far short of meeting Exelon's expectations as evidenced by his failure to follow the approved reactor start-up and shut-down safety procedures and his poor showing in the LAP interviews, when he was rated "developmental" or deficient[10] in all but three out of the eleven categories in which his leadership and behavior skills were rated. Cichon does not argue that Exelon's expectations were unreasonable or not bona fide. *See Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1090 (7th Cir. 2000). Since Cichon has failed to demonstrate that "he was performing his [Unit Supervisor] job in a satisfactory manner" and meeting his employer's legitimate business expectations that its management-level employees possess and demonstrate the requisite leadership and behavioral skills, he has failed to establish a prima facie case of retaliation in regards to his removal from this position. *Stone*, 281 F.3d at 644.

Even assuming *arguendo* that Cichon had established a prima facie case of retaliation, his claim would still ultimately fail due to the fact that he has failed to present any evidence that would establish that Exelon's proffered reasons for removing him were pretextual. In error Cichon asserts that he was the only Unit Supervisor removed as a result of the LAP; a contention which is devoid of any support in the record. To the contrary, at least two other individuals were removed due to poor performance in the LAP evaluations. Furthermore, because Cichon failed to

---

[10] *See supra* notes 3, 9.

present any evidence that Exelon relied on anything other than his poor work performance and negative LAP evaluations when it removed him, we need not inquire any further into the wisdom of its employment decisions. *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003). We conclude that the district court's grant of summary judgment to Exelon on Cichon's claim of retaliation in his removal from the Unit Supervisor position was proper.

2. **Failure to Hire for the Turbine Project Manager Position**

Cichon argues that summary judgment was improper on his claim that Exelon retaliated against him when not hiring him for the Turbine Project Manager position, and contends that he produced sufficient evidence to demonstrate a disputed issue of fact as to whether Exelon's proffered reason for not hiring him for the position was pretextual. We agree with the district court's determination that Cichon produced sufficient evidence to make out a prima facie case on the failure to hire portion of his retaliation claim when he demonstrated that: 1) he engaged in a statutorily protected activity by filing an FLSA lawsuit, *see Sapperstein v. Hager*, 188 F.3d 852, 857 (7th Cir. 1999); 2) he applied and had the technical qualifications required for the Turbine Project Manager position; 3) he was not hired for the position; and 4) a similarly situated individual who did not file a complaint under the FLSA was hired for the position (Tim Nolan). *Volovsek v. Wis. Dep't of Agric., Trade, & Consumer Prot.*, 344 F.3d 680, 692 (7th Cir. 2003); *Stone*, 281 F.3d at 644. Thus, the burden shifted to Exelon to offer a legitimate, non-retaliatory reason for not hiring Cichon for the Turbine Project Manager position. *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002). We hold that Exelon did fulfill this burden by pointing out and providing evidence that

Cichon was not hired because the candidate selected, Tim Nolan, demonstrated that he was more qualified and possessed better overall leadership and behavioral skills when he achieved better scores than Cichon during the interview and rating process. Further, Tim Kelly, one of the individuals who interviewed both Cichon and Nolan for the position, stated that Nolan was hired instead of Cichon simply because of his higher score, and not because Cichon had filed an FLSA lawsuit against Exelon (Kelly explained that he had no knowledge of a lawsuit being filed until Cichon offered the information during the interview). In order for Cichon's claim to advance beyond the summary judgment stage, it was his responsibility to offer the district court evidence that created "an issue of material fact as to whether [Exelon's] proffered reasons [for not hiring him were] merely pretext for unlawful discrimination or retaliation," *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004), which he has failed to do. "To demonstrate pretext, [Cichon] must demonstrate that [Exelon's] articulated reason for [not hiring him] either: 1) had no basis in fact; 2) did not actually motivate its decision; or 3) was insufficient to motivate its decision." *Grayson v. O'Neill*, 308 F.3d 808, 820 (7th Cir. 2002).

Cichon did not directly attack Exelon's proffered reason for choosing Nolan as the more qualified candidate, *i.e.*, that Nolan exhibited superior overall leadership and behavioral skills during the interviewing process. If Cichon had advanced such an argument, he would be facing an uphill battle in attempting to discredit Exelon's statement that it hired Nolan because he was better qualified than Cichon as pretextual, even when considering that Exelon's evaluation of the two applicants was based on subjective evaluation criterion such as the candidates' "leadership and behavioral skills." This is because "where an employer's proffered non-discriminatory reason for its employment decision is that it selected the most qualified candidate, evidence of the

applicants' competing qualifications <u>does not constitute evidence of pretext</u> 'unless [the plaintiff's case demonstrates that those qualifications] are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue.' " *Millbrook*, 280 F.3d at 1180 (quoting *Deines v. Texas Dep't of Protective & Regulatory Servs.*, 164 F.3d 277, 279 (5th Cir. 1999)) (emphasis added). Cichon failed to present any evidence that directly called into question the veracity of Exelon's reason for hiring Nolan instead of himself.

Instead, Cichon mounted an indirect attack on the integrity of the interviewing panel and its process that resulted in Nolan's selection, by accusing one of his interviewers, Kelly, of manipulating his evaluation of Cichon in order that Nolan would be awarded the position. Without a scintilla of proof, evidence or substantiation of any kind to support his claim, Cichon alleges that Kelly, who had told Cichon before the interviewing process began that Cichon might be a "good fit" for the job, did an about-face after learning of Cichon's FLSA lawsuit against Exelon and purposely gave him (Cichon) a lower score than Nolan to sabotage his prospects of being selected for the position. Cichon posits that such an allegation was sufficient to create a disputed issue of fact as to whether Exelon's proffered reason for hiring Nolan was pretextual. We disagree.

First of all, Kelly's having told Cichon prior to the interviewing process that he was a "good fit" for the job does not *ipso facto* create an inference that Kelly's assessment of Cichon following the interview was prompted by a retaliatory animus instead of Kelly's forthright evaluation of Cichon's leadership and behavioral skills. Kelly's pre-interview comment noting that Cichon was well-suited for the job was based on his knowledge of Cichon's technical qualifications, but the interviewing process was designed to sort through the more technically-qualified candidates to

find the applicant who possessed the superior leadership as well as behavioral skills. Cichon's "mere qualification [for the position] does not mean that [he] must get the job . . . . [a]nd in choosing between different candidates, all of whom are qualified, an employer may legitimately use subjective qualifications." *Perfetti v. First Nat'l Bank of Chicago*, 950 F.2d 449, 458 (7th Cir. 1991). The opinion of one person in isolation that Cichon would be a "good fit" for the job is not persuasive evidence that Cichon was the most qualified person for the position, much less the person that would be hired. In addition, Kelly's statement does not controvert Cichon's poor performance in the other stages of the interview process. The decision that Nolan was a more attractive candidate than Cichon came at the end of a collaborative interview process that included input from a number of interviewers other than Kelly, and as this court has reiterated time and time again, "[w]e do not sit as a superpersonnel department that reexamines an entity's business decision and reviews the propriety of that decision." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) (citation removed).

Second, Cichon failed to present evidence from which a rational decisionmaker could logically infer that, based on the fact that Kelly knew about Cichon's FLSA lawsuit, Kelly was motivated by a retaliatory animus when he determined that Cichon did not possess the necessary leadership and behavioral skills to merit a higher score than Nolan in the interviewing process. *See Eiland v. Trinity Hosp.*, 150 F.3d 747, 753 (7th Cir. 1998); *Kearney v. Town of Wareham*, 316 F.3d 18, 23 (1st Cir. 2002). Cichon gave no logical explanation or reason as to why Kelly, who like Cichon was a management-level employee at Exelon, would take such umbrage to Cichon's having filed an FLSA lawsuit against Exelon—protesting the company's decision to cut overtime pay for management-level employees—that he would take it upon himself to sabotage Cichon's chances of being awarded the

Turbine Project Manager position. Indeed, accepting Cichon's speculative theory that Kelly harbored a retaliatory motive when he interviewed him, and essentially acted as a pawn in Exelon's alleged nefarious scheme, *see Eiland*, 150 F.3d at 752, would require us to also implicate some or all of the other three individuals who interviewed him in a conspiracy designed to thwart Cichon's prospects of obtaining the Turbine Project Manager position. "We have typically been wary of allegations based on nothing [more than a bold statement in] an attempt to come up with a conspiracy theory and in particular where there is not a scintilla of evidence in the record before us to support [Cichon's] theory." *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1007 (7th Cir. 2002); *see also Perfetti*, 950 F.2d at 453. And we are even more skeptical of Cichon's conspiratorial retaliation allegations because he himself engineered this scenario by informing Kelly during the interviewing process that he had filed an FLSA lawsuit against Exelon—recall that before interviewing Cichon, Kelly had no knowledge of Cichon's lawsuit and only learned about it when Cichon volunteered the information.

Cichon has provided no evidence other than bald, self-serving assertions that would allow us to rationally infer that Kelly was motivated by a retaliatory animus to redirect the selection process for the Turbine Project Manager position to exclude Cichon. Indeed, there is no reason to believe Kelly's evaluation of Cichon during the interviewing process was based on anything besides a fair and well-reasoned assessment of Cichon's leadership and behavioral skills. Kelly flatly denied that his knowledge of Cichon's lawsuit had any affect on his decisions during the interviewing process. Thus, the only way in which Cichon could prevail on his allegation of pretext would be to demonstrate that Kelly was not being truthful when he made this statement. *Perfetti*, 950 F.2d at 456. However, because Cichon has the ultimate burden of proof to demonstrate that Exelon engaged

in retaliatory conduct, *see David v. Caterpillar, Inc.*, 324 F.3d 851, 858 (7th Cir. 2003), he cannot create a triable dispute of fact " 'if his only 'evidence' [is that Exelon's] witnesses [are] not worthy of belief. That would [be] a no-evidence case, and such a case [Cichon] must lose, because he has the burden of proof.' " *Millbrook*, 280 F.3d at 1181 (quoting *EEOC v. G-K-G, Inc.*, 39 F.3d 740, 746 (7th Cir. 1994)). Put differently, it is impossible for Cichon to meet his burden of proof and demonstrate retaliatory conduct "by relying on the hope that the jury will not trust the credibility of [Exelon's] witnesses." *Perfetti*, 950 F.2d at 456. Without some shred of affirmative evidence to call into question Kelly's credibility, Cichon must lose. *Id.*; *see also Massey v. Blue Cross-Blue Shield of Illinois*, 226 F.3d 922, 926 (7th Cir. 2000). As demonstrated above, Cichon has presented no such evidence. Accordingly "what this case really comes down to is . . . deciding which applicant is more qualified," a decision that we leave to the employer. *Millbrook*, 280 F.3d at 1183. Filing a lawsuit under the FLSA does not immunize an employee from adverse employment actions, or prevent "the employer from exercising its business judgment." *Blackie v. Maine*, 75 F.3d 716, 723 (1st Cir. 1996). Cichon's indirect, insubstantial evidence fell far short of demonstrating that Exelon's proffered reason for hiring Nolan was pretextual. *See Perfetti*, 950 F.2d at 452. We thus conclude that the district court's grant of summary judgment to Exelon on Cichon's claim that he was not hired for the Turbine Project Manager position in retaliation for filing an FLSA lawsuit was proper.


## IV. CONCLUSION

The decision of the district court is

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*